UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA               :
:
- against -                            :
:            3:06 Cr. 00137 (CFD)
RONALD E. FERGUSON,                    :
CHRISTOPHER P. GARAND,                 :
ROBERT D. GRAHAM,                      :
CHRISTIAN M. MILTON, and               :
ELIZABETH A. MONRAD,                   :
:
Defendants.         :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT CHRISTIAN M. MILTON'S
MOTION *IN LIMINE* TO EXCLUDE
<u>EVIDENCE RELATING TO HIS COMPENSATION</u>**


HAFETZ & NECHELES
500 Fifth Avenue
29th Floor
New York, NY 10110


SHEEHAN & REEVE
139 Orange Street
Suite 301
New Haven, CT 06510

*Attorneys for Defendant
Christian M. Milton*

{00077693.DOC;1}

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA :
:
    - against - :
: 3:06 Cr. 00137 (CFD)
RONALD E. FERGUSON, :
CHRISTOPHER P. GARAND, :
ROBERT D. GRAHAM, :
CHRISTIAN M. MILTON, and :
ELIZABETH A. MONRAD, :
:
                      Defendants. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT CHRISTIAN M. MILTON'S
MOTION *IN LIMINE* TO EXCLUDE
EVIDENCE RELATING TO HIS COMPENSATION**

Mr. Milton moves to exclude at trial evidence relating to his compensation. The government's proposed Exhibits 9 ("Govt. Ex. 9") and 10 ("Govt. Ex.10") contain documents relating to Mr. Milton's receipt of deferred compensation, salary, bonuses, and stock dividends. Mr. Milton anticipates that the government intends to use this evidence at trial in an attempt to demonstrate that he committed the acts alleged in the Indictment with the motive of enriching himself.  Mr. Milton moves to exclude government exhibits 9 and 10 from evidence at trial because they are not only irrelevant to proof of his motive, but are highly prejudicial.

The government's proposed compensation-related exhibits total 757 pages and reference approximately 24 years of deferred compensation, salary, stock dividends, and bonuses earned by Mr. Milton.  The documents in Govt. Ex. 9 and Govt. Ex. 10 are

clearly irrelevant and therefore inadmissible under Fed.R.Evid 401. Even were this Court to consider the compensation-related evidence to be minimally relevant, the documents should be excluded pursuant to Fed.R.Evid.403 because their probative value is substantially outweighed by their prejudicial effect. The overwhelming effect of these documents is to paint Mr. Milton as an extremely highly paid AIG executive who – by virtue of his position – either participated in the fraud or deserves to bear responsibility for any corporate wrongdoing that occurred.

## BACKGROUND

In 1981, Mr. Milton became a participant in a series of deferred compensation plans administered by Starr International Company, Inc. ("SICO") for the benefit of key employees of AIG and its affiliates.[1] *See* Govt. Ex. 9, SICO 218, attached as Exhibit A ("Ex. A"). Each plan was for a two-year period and commenced on January 1 of an odd-numbered year. *See, e.g., id.,* SICO 5. By way of example, the plan for 1997/1998 commenced on January 1, 1997, and the plan for 1999/2000 began on January 1, 1999. The SICO deferred compensation program ceased after the 2003-04 plan. *Id.,* SICO 218.

Each deferred compensation plan entitled participants to receive AIG shares of stock on a contingent basis. *See, e.g., id.*, SICO 1. At the outset of each two-year plan, participants received a certain number of participation units. *Id.,* SICO 2. The number of shares granted per unit depended on AIG's overall performance during the plan period, and was not determined until a few months after the end of the plan. *Id.* For example, participation units for the 1997/1998 plan were awarded in January 1997, but the number of contingent shares to be awarded per unit was not determined until March of 1999. *See id.*, SICO 176.

---

[1] SICO owned a significant number of AIG shares and administered the plan on AIG's behalf.

The right to the shares vested upon retirement at age 65, provided the participant remained employed at AIG until such time.[2]  *See, e.g., id.,* SICO 8.  The value of the shares awarded was calculated at the time of payment upon retirement and not when the units or shares were contingently awarded.

The only shares that a participant could receive prior to retirement were those shares which were subject to an early payout option.[3] This option applied to 35% of the shares granted to Mr. Milton in the 1991/92 plan and subsequent two-year plans.[4]  *See id.,* SICO 181-82. The value of early payout shares was to be determined *at the time of early payout.* [5] *Id.* Contingent shares not subject to early payout became available to Mr. Milton only upon his retirement. The early payout option had no impact on any of the shares contingently awarded to Mr. Milton from plans earlier than 1991/92, as they remained part of the plan until his retirement.

The timing of election and receipt of early payouts was quite complex.  A participant did not have the option to elect to take the early payout until approximately 1 ½ years after the respective plan period ended. *See id.* Second, the early payout consisted of two separate payments for each two-year plan period. For example, if Mr.

---

[2]  Section 7 of the General Rules of the SICO deferred compensation program provides that any shares contingently set aside for the participant and not distributed as an early payout shall not vest until the participant fulfills the employment conditions retires at age 65.  *See* Ex. A, SICO 8 ("The participant will forfeit any and all rights to or interest in any such undistributed Acquired Stock contingently set aside for such Individual in the event his/her employment with the Employer terminates or is terminated for any reason (other than death or permanent disability) including, but not limited to, ...dismissal prior to such retirement at age 65.") The only exception to such forfeiture in the event of a participant's termination is when (according to Section 6A of the general rules governing the plan) the directors of SICO in their sole discretion reinstate by their written consent the contingent rights to a participants Acquired Stock. *See id.*, SICO 7-8.

[3]  In 1996, SICO announced an early payout option that applied to the 1991/92 plan period and all subsequent plans.  *See* Ex. A, SICO 144-45.

[4]  Mr. Milton was eligible for a 50% early payout with respect to the 1991/92 and 1993/94 plans because he was an Associate for those plans; beginning with the 1995/96 plan he became a partner and as a result he could only exercise an early payout with respect to 35% of the shares contingently awarded to him for that plan and for future plans. Ex. A, SICO 181-82

[5]  All early payouts were net of tax and other withholding amounts. *See, e.g.,* Ex. 9, SICO 182.

Milton elected the 35% early payout option, he received one-half of the 35% (i.e., 17.5%) of his shares approximately 2 ½ years after the plan period, and the other 17.5% one year later, or 3 ½ years after the plan period. *Id. F*or example, with respect to the 1997/1998 plan period, Mr. Milton elected in February of 2000 to receive 17.5% of his shares on May 1, 2001 and another 17.5% on May 1, 2002. *See id.,* SICO 180. So, the time at which a plan began and participation units were granted until the time at which early payouts were received spanned more than five years.

The following chart may prove useful to clarifying the timing of the election and distribution of early payouts:

| Plan Period | Award of Participation Units | Award of Shares | Date of Early Payout Election | Date of 1st Early Payout of 17.5% | Date of 2nd Early Payout of 17.5% |
|---|---|---|---|---|---|
| 1997/98 | January, 1997 | March, 1999 | February, 2000 | May 1, 2001 | May 1, 2002 |

*See id.,* SICO 176-77.

Govt. Ex. 9 consists of a large number of documents containing the details of Mr. Milton's financial remuneration, including the accumulated stock valuations (at the then current stock price) of the shares of AIG stock contingently granted to him pursuant to the deferred compensation plans, his early payouts under the plan, and bonuses. The documents appear to indicate the following with regard to Mr. Milton's accumulation of contingent shares and their valuations:

| Date | Number of Shares | Price Per Share | Pre-Tax Valuation |
|---|---|---|---|
| November, 2000 | 63,550 | $97.31 | $6,184,175 |
| May, 2001 | 71, 987 | $82.90 | $5,967,735 |
| May, 2002 | 69,625 | $70.61 | $4,916,196 |
| March, 2003 | 78,025 | $47.88 | $3,735,820 |
| May, 2004 | 74,245 | $71.65 | $5,319,629.17 |
| March, 2005 | 82,644 | $67.00 | $5,537,148 |

*See id.,* SICO 183, 26, 730, 211, 706, 32.

Of course, the vast majority of these shares were not to be received until retirement at age sixty-five, which for Milton was November, 2012. And again, the value of the retirement shares was to be determined with regard to the stock price at the time of payout, and not the price when the participant units were awarded, during the plan period, or at the time the shares themselves were awarded.

At the same time as Mr. Milton was accumulating contingent shares, he also received early payouts as follows:

| Plan Period | Early Payout | Number of Shares | Pre-Tax Amount |
| --- | --- | --- | --- |
| 1997/1998 | May 1, 2001 | 2,362.50 | $195,851.25 |
| 1997/1998 | May 1, 2002 | 2,362.50 | $166,816.13 |
| 1999/2000 | May 1, 2003 | 1,890 | $108,278.00 |
| 1999/2000 | May 1, 2004 | 1,890 | $135,438.50 |
| 2001/2002 | May 1, 2005 | 1,470 | $74,749.50 |
| 2001/2002 | May 1, 2006 | 1,470 | $95,094.30 |

*See id.,*, SICO 180, 728, 642, 730, 210, 571, 662, 217, 705-707, 709.

Finally, AIG had in place a two-year bonus arrangement for selected employees who had demonstrated outstanding performance. The bonus was set at the beginning of the two-year plan period, and its amount was unrelated to AIG's stock price. For example, in February, 1997, Mr. Milton received notice that he would receive two bonuses of $60,000, one in 1997 and the second in 1998. *Id.,* SICO 167.

According to the government documents, Mr. Milton appears to have received bonuses as follows:

{00077693.DOC;1}                              5

| Year | Amount |
|---|---|
| 1997 | $60,000 |
| 1998 | $60,000 |
| 1999 | $60,000 |
| 2000 | $60,000 |
| 2001 | $70,000 |
| 2002 | $70,000 |
| 2003 | $70,000 |
| 2004 | $70,000 |
| 2005 | $85,000 |
| 2006 | $85,000 |

The total value of Mr. Milton's bonuses (before taxes), as reflected in Govt. Ex. 9 was $690,000. *See id.,* SICO 131, 167, 175, 207, 216, 688.

Govt. Ex. 10 contains documents indicating Mr. Milton's remuneration at CV Starr in 2005-06, where he worked after his termination from AIG. *See* Govt. Ex. 10 CVSTARR-USAO 1-7, attached as Exhibit B ("Ex. B"). These documents appear to show that Mr. Milton earned $424,000.99 in salary and $290,000 in dividends in 2006, and $885,000 in deferred dividends from 2002 through 2005. *See Id.,* CVSTARR-USAO 7, 10.

**ARGUMENT**

1. **Evidence of Mr. Milton's Compensation Should Be Excluded Pursuant to Fed.R.Evid. 401**

The evidence of Mr. Milton's compensation contained within Exhibits 9 and 10 may not be admitted because it is irrelevant to proving Mr. Milton's motive to commit the crimes charged in the Indictment. There is no probative value whatsoever to documents summarizing Mr. Milton's accumulated shares in the deferred compensation program over time. Mr. Milton's future receipt of stock shares was simply too distant from the time of the fraud for a reasonable inference of motive from this evidence. Furthermore, Mr. Milton's salary and bonuses, and the stock dividends he received from C.V. Starr are similarly irrelevant to any personal financial motive of Mr. Milton. Mr. Milton's alleged motive to increase AIG's stock price could have no bearing on these elements of his compensation, as their value was unrelated to the price of AIG stock.

The government will presumably argue that Mr. Milton conspired fraudulently to structure a sham reinsurance transaction to maintain and increase the market price of AIG's stock with the motive of personal financial gain. Superseding Indictment ¶¶ 38, 39, attached as Exhibit C ("Ex. C"). The gravamen of the charged conduct against Mr. Milton took place in late 2000 and early 2001. *See id.* ¶¶ 44c, m, t, v, y, bb, ee, oo, pp, vv, ww, yy. Thus, in order to succeed in its theory, the government must prove a nexus between this charged conduct and the alleged motive for financial gain.

The government will likely argue that Mr. Milton caused the LPT to be fraudulently booked in early 2001 because he believed that the fraud would keep AIG's stock price high and therefore increase the value of his contingent shares of stock. Yet, there is simply no basis for asserting that Mr. Milton engaged in fraudulent conduct to

maintain or increase the value of AIG stock so that in 2012, his retirement package would be more valuable. Nor would an inference that Mr. Milton engaged in fraud because he believed it would maintain or increase AIG's stock price years later be reasonable. The volatility of the stock market (and AIG's stock price) and the temporal distance between the alleged criminal acts and the price of AIG stock in subsequent years render such an inference too attenuated to be probative. *Cf., Mesnick v. General Elec. Corp.,* 950 F.2d 816, 828 (1st Cir.1991) (nine-month period between protected conduct and alleged retaliation regarded as undermining inference of causation).

     Accordingly, evidence of the number of share Mr. Milton accumulated over time (and their shifting value depending on then current stock price) is inadmissible. As demonstrated *supra* at 4, the government proposes to admit evidence of Mr. Milton's accumulating shares from 2000 forward. Yet, the value of Mr. Milton's accumulated retirement shares in 2000, 2001, 2002, or at any other time, is not probative of his motive for committing the charged crime. The only inference that can be drawn from this evidence is that Mr. Milton would likely find himself a wealthy man upon retirement. No reasonable inference may be drawn that because Mr. Milton would receive a considerable amount of stock at retirement, he committed the charged fraud with the motive of increasing the value of his holdings some twelve years later.

     Similarly, evidence of Mr. Milton's salary at AIG and CV Starr, bonuses received, and CV Starr dividends are inadmissible pursuant to Rule 401. Because their value was not linked to the price of AIG stock, this evidence cannot be connected to any motive Mr. Milton may have held for allegedly committing the charged crimes. Thus, neither the salary, bonuses, nor CV Starr dividends are relevant to any action that Mr.

Milton allegedly took in late 2000 and early 2001, to maintain and increase the market price of AIG's stock." *See* Ex. C, Superseding Indictment ¶38.

The only deferred compensation that could arguably be linked to the alleged criminal conduct (because of its timing) is the early payout of $195,851.25 in AIG shares that Mr. Milton received on May 1, 2001.[6] Yet, even here, Mr. Milton had elected to receive this early payout in February, 2000. Thus, because this payment was already due Mr. Milton before the commission of the alleged fraud, his motive could only have been a desire for whatever *marginal benefit* in the value of the 2,362 shares might follow from an artificial increase in AIG's stock price. Thus, the $195,851.25 is not relevant because it constitutes a prize for Mr. Milton's fraud. It is the anticipated difference between that sum and the price to which AIG stock might otherwise have fallen, that would constitute the goal of Mr. Milton's alleged illegal acts. Thus, whatever probative value this relatively insignificant sum might have with regard to Mr. Milton's motive to commit the alleged fraud is very weak, indeed.

No other early payouts of Mr. Milton's deferred compensation – not three years later, two years later, or even a year later can reasonably be linked to Mr. Milton's conduct in late 2000 and early 2001. These later payouts are simply too far removed from Mr. Milton's alleged criminal conduct to constitute a motive for Mr. Milton's alleged criminal conduct. No reasonable person could conclude that Mr. Milton would have committed the charged crimes with the hope that an artificially maintained or increased stock price in the spring of 2001 would increase the value of an early deferred compensation payout a year or more later.

---

[6] This payout represented 17.5 % of the shares awarded him in connection with the 1997/1998 deferred compensation plan. *See* Ex. A, SICO 180, 728.

Accordingly, pursuant to Rule 401, the Court should exclude at trial the compensation-related documents in government exhibits 9 and 10. Moreover, as demonstrated below, even were the Court to deem Mr. Milton's May 1, 2001 early payout as minimally relevant , any evidence of Mr. Milton's compensation must be excluded pursuant to Fed.R.Evid. 403.

> 2. **Evidence of Mr. Milton's Deferred Compensation, Early Payouts, Salary, Bonuses, and Stock Dividends Are Inadmissible at Trial Pursuant to Fed.R.Evid. 403**

Admission at trial of evidence of Mr. Milton's deferred compensation, early payouts, salary, bonuses, and CV Starr stock dividends would be highly prejudicial at trial, and therefore must be excluded pursuant to Fed.R.Evid. 403. As shown above, Mr. Milton was highly compensated at AIG and CV Starr, though the vast majority of his earnings were in the form of retirement benefits. If the government were permitted to offer in evidence the sum total of Mr. Milton's remuneration – deferred and otherwise – that number, approximately $8.5 million, would improperly introduce wealth as a factor in the jury's consideration of Mr. Milton's culpability.

Unfair prejudice "'means an undue tendency to suggest decision on an improper basis . . . . Put another way, courts should be sensitive to any 'unfair advantage that results from the capacity of the evidence to persuade by illegitimate means.'" *United States v. Birney*, 686 F.2d 102, 106 (1982) (citations omitted). Evidence of Mr. Milton's deferred compensation, salary, bonuses, and CV Starr dividends clearly have the capacity to improperly sway a jury. *See, e.g., United States v. Cassese,* 290 F.Supp.2d 443, 457 (S.D.N.Y. 2003), *aff'd* 428 F.3d 92 (2d Cir. 2005) (introduction of defendant's wealth, salary, and stock holdings highly prejudicial and inflammatory because it "played into a

bias against people of wealth"); *United States v. Stahl,* 616 F.2d 30, 32-33 (2d Cir. 1980) (reversing conviction where prosecutor emphasized defendant's wealth during opening and examination of witnesses, thereby appealing to class prejudice); *Loussier v. Universal Music Group, Inc.* 2007 WL 1098687 (S.D.N.Y. Apr. 11, 2007), slip op at *2 (evidence of defendant's wealth excluded because of unfair prejudice that might result from jurors basing their conclusions on relative wealth of the parties). As such, this evidence must be excluded at trial.

For example, one of the government's items of proposed evidence is a Starr International Company, Inc., "Millionaires List." *See* Ex. A, SICO 655. This document lists Mr. Milton as having accumulated contingently, as of June 30, 2002, approximately $6.5 million in shares (valued at the then current price of $70 per share.)  Even were this evidence minimally relevant to his motive to commit the fraud – and it is not – the effect of this evidence would be to inject Mr. Milton's wealth into the trial as an impermissible factor for the jury's consideration.

Mr. Milton will stand as the sole AIG representative at trial. The introduction of the value of his concerning the contingent value of Mr. Milton's shares of AIG stock, his salary, and his dividends from CV Starr is very likely to result in the jury's improper conclusion that an executive of his stature must have been responsible for AIG's alleged wrongful accounting.  *See Stahl*, 616 F.2d at 32.  Moreover, the introduction of such evidence would likely engender prejudice against him because of bias against individuals with wealth. *See Cassese,* 290 F.Supp.2d 443 at 457.

Even conceding that evidence of Mr. Milton's May 1, 2001 early payout might prove relevant to his motive to commit the alleged crime, that evidence should be

excluded because – if admitted – Mr. Milton would be forced to defend himself with the very highly prejudicial evidence concerning his personal wealth he seeks to exclude. In order to demonstrate that he did not commit criminal fraud in order to earn a relatively small marginal gain, Mr. Milton would need to demonstrate to the jury how miniscule such incentive would have been in light of his overall financial holdings. Yet, it is the very evidence of Mr. Milton's wealth that poses the danger of significant prejudice against him at trial. The government should not be permitted to compel Mr. Milton to introduce unfairly prejudicial evidence in his own defense – evidence that the government itself could not introduce. Simply put, the government should not be allowed to slip in through the back door what is barred at the front.

For these reasons, evidence relating to Mr. Milton's remuneration – his deferred compensation, early payouts, salary, bonuses, and stock dividends – is unduly prejudicial and should be excluded at trial pursuant to Fed.R.Evid. 403.

## CONCLUSION

For the reasons stated above, the Court should grant Mr. Milton's motion to exclude evidence of compensation at trial.

Dated: September 12, 2007
     New York, New York                          Respectfully submitted,

 /s/ Frederick P. Hafetz                          /s/ Richard A. Reeve
Frederick P. Hafetz (ct07473)                   Richard A. Reeve (ct 05084)
Tracy E. Sivitz (phv01736)                      SHEEHAN & REEVE
Michael S. Chernis (phv01158)                   139 Orange Street
HAFETZ & NECHELES                               Suite 301
500 Fifth Avenue                                New Haven, CT 06510
29th Floor                                      Telephone: 203 787 9026
New York, NY 10110                              Facsimile: 203 787 9031
Telephone: 212 997 7595                         E-mail: rareeve51@snet.net
Facsimile: 212 997 7646

E-mail: fph@hafetzlaw.com

*Attorneys for Defendant Christian M. Milton*

**CERTIFICATE OF SERVICE**

      I hereby certify that on September 12, 2007, a true and correct copy of the Memorandum of Law In Support of Defendant Christian M. Milton's Motion *In* Limine to Exclude Evidence of His Compensation was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by electronic mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

                          /s/ Tracy E. Sivitz
                        Tracy E. Sivitz (phv 01736)
                        Hafetz & Necheles
                        500 Fifth Avenue
                        29th Floor
                        New York, NY 10220
                        Telephone:  (212) 997-7595
                        Facsimile  (212) 997-7646