## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA )
                                          )
                     v.                  )         Crim. No. 3:06 CR 137 (CFD)
                                           )
RONALD E. FERGUSON, )
CHRISTOPHER P. GARAND, )
ROBERT D. GRAHAM, )
CHRISTIAN M. MILTON and )
ELIZABETH A. MONRAD, )
                                           )
                     *Defendants.*      )

## DEFENDANT RONALD E. FERGUSON'S RESPONSE
## TO THE GOVERNMENT'S SENTENCING MEMORANDUM

CADWALADER, WICKERSHAM & TAFT LLP
Michael E. Horowitz (Bar No. phv01191)
1201 F Street, N.W.
Washington, DC  20004
Telephone:  (202) 862-2200

Clifford H. Schoenberg (Bar No. ct16215)
Douglas I. Koff (Bar No. phv01207)
One World Financial Center
New York, NY  10281
Telephone:  (212) 504-6000

DALY & PAVLIS LLC
Alfred U. Pavlis (Bar No. ct08603)
107 John Street
Southport, CT 06890
Telephone:  (203) 255-6700

*Attorneys for Defendant Ronald E. Ferguson*

Dated: September 19, 2008

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

POINT I     TO THE EXTENT ANY ROLE ADJUSTMENT IS WARRANTED, IT
SHOULD BE A MINOR ROLE REDUCTION, NOT AN
AGGRAVATING ROLE ENHANCEMENT .......................................................1

    A.    Introduction...................................................................................2

    B.    Mr. Ferguson's CEO Title is Irrelevant .......................................................7

    C.    Mr. Ferguson Did Not Exercise Discretion, Control or Authority
Over Others With Respect to the LPT Fraud and had Minimal
Involvement in the LPT's Planning and Organization ................................8

    D.    Mr. Ferguson Exercised No Authority With Respect to the LPT's
Reputation or Securities Regulatory Risk..................................................11

        1.    Reputation Risk..........................................................................11

        2.    Securities Regulatory Risk...........................................................13

    E.    Mr. Ferguson's Request to "Keep the Circle As Tight As Possible"
Does Not Evidence Leadership of the Charged Fraud...............................15

    F.    Mr. Napier's Updates to Mr. Ferguson Do Not Demonstrate that
Mr. Ferguson was a Leader of the Charged Fraud....................................20

    G.    ████████████████   ████████████████..........................20

    H.    Mr. Ferguson Did Not "Negotiate" the LPT with Mr. Greenberg.............21

    I.    Polite "Thank You's" Do Not Render Mr. Ferguson a Leader of
the Charged Fraud.....................................................................................22

    J.    Mr. Ferguson Did Not Receive Any Share of the Fruits of the LPT;
and There is No Risk of Recidivism ..........................................................23

CONCLUSION....................................................................................................................25

Defendant Ronald E. Ferguson, by his attorneys, respectfully submits this brief in response to the Government's Sentencing Memorandum ("Gov't Memo") [Dkt. #1115; 9/05/2008] and pursuant to the Court's Scheduling Order entered on July 28, 2008 [Dkt. #1088].

## PRELIMINARY STATEMENT

The government chose not to address in the Gov't Memo any of the relevant factors listed in 18 U.S.C. § 3553(a) that this Court must consider in sentencing Mr. Ferguson. Consequently, Mr. Ferguson has nothing to respond to at this point with respect to those factors.

This brief is, thus, confined to responding to the government's argument in favor of an aggravating role enhancement under U.S.S.G. § 3B1.1(a). As explained below, to the extent any role adjustment is warranted, it should be a *minor* role adjustment under U.S.S.G. § 3B1.2(b). Mr. Ferguson responds to the government's arguments regarding loss and number of victims in a separate reply brief submitted today on behalf of all defendants.[1]

## POINT I

### TO THE EXTENT ANY ROLE ADJUSTMENT IS WARRANTED, IT SHOULD BE A MINOR ROLE REDUCTION, NOT AN AGGRAVATING ROLE ENHANCEMENT

"[T]he Probation Office . . . agrees with defense counsel, that the government has not met its burden of proof in support of [an aggravating role enhancement for Mr. Ferguson]." PSR Addendum at 1. Despite that PSR finding, the government repeats (word for word) in the Gov't Memo the same erroneous arguments it previously made to the Probation Office. *See* Gov't Memo at 39-43. As explained in Mr. Ferguson's Sentencing Memorandum [Dkt. # 1131] ("Initial Sentencing Memo"), to the extent any role adjustment is warranted, it should be a *minor* role adjustment pursuant to U.S.S.G. § 3B1.2(b), because he is (i) less culpable than the typical

---

[1]  The government agrees that an "abuse of position of trust" enhancement under U.S.S.G. § 3B1.3, which was recommended in the PSR but objected to by Mr. Ferguson, is inapplicable to his sentence. *See* Gov't Memo at 10.

defendant convicted of a business fraud; and (ii) among the least culpable of his co-participants. *See* Ferguson Br. at 95-97; *see also United States v. Perez*, 321 F. Supp. 2d 574, 584 (S.D.N.Y. 2003). *See* Initial Sentencing Memo at 95-97.

## A.    Introduction

As a primary basis for seeking a major role enhancement, the government cites Mr. Ferguson's role in fielding a call from AIG's CEO on October 31, 2000, agreeing to consider a reinsurance transaction with AIG, and thereafter "task[ing]" Richard Napier with "coordinating the deal" and "respon[ding] to Greenberg's request." Gov't Memo at 40-41. The central flaw in that argument is that, as Mr. Napier testified, the contemplated transaction did not become improper until at least two weeks later. That is when the participants working on the details (which did not include Mr. Ferguson) abandoned efforts to structure a genuine reinsurance transaction – one that transferred at least enough risk to AIG to satisfy the governing accounting standard for booking loss reserves – in favor of a deal presenting no risk. Thus, Mr. Ferguson's actions in October 2000 cannot be viewed as the actions of a ringleader "organiz[ing] or lead[ing]" any criminal activity. U.S.S.G. § 3B1.1(a).[2]

In order to understand why this is so, it is useful to review what the testimony revealed about the nature of the finite reinsurance industry. It was undisputed at trial that a transaction between two insurance companies need not transfer large amounts of risk in order to qualify as a "reinsurance" (or "risk") transaction for accounting purposes, with accompanying loss reserves. It was likewise undisputed that during the period in question, insurance companies routinely entered into so-called "finite reinsurance" policies that transferred only the barest amounts of risk needed to justify treating the amounts as loss reserves under the accounting rules set forth in Financial Accounting Standard ("FAS") 113. Under FAS 113, reinsurers may book

---

[2]    By the same token, Mr. Ferguson's actions cannot be said to have "created th[e LPT] scheme," which courts have found to be a basis for a *mitigating* role downward adjustment. *United States v. Bifield*, 42 F. Supp. 2d 477, 486 (M.D. Pa. 1999) (granting 3-level mitigating role adjustment because defendant did not "create[] the scheme").

the entire amount of a finite transaction as a "risk" deal (with an accompanying adjustment to loss reserves) so long as the risk of a "significant" loss is even a smidgen more than "remote." Ex. 1 (FAS 113 at ¶ 9); *see also* Trial Transcript ("Tr.") at 537-40 (Schroeder).[3]  It was also undisputed at trial that, when this minimum risk threshold was met, it was entirely appropriate for insurance companies to enter into finite reinsurance transactions *solely to affect investor perceptions of their balance sheets* and without significantly altering their underlying economic situations.[4]

These facts form a critical backdrop for understanding Mr. Ferguson's response to his October 31 conversation with AIG's CEO and demonstrate why someone in Mr. Ferguson's shoes would have had no reason to believe that the requested transaction was improper.  The proposed structure only became illegitimate when the effort to meet the minimum risk threshold of FAS 113 was abandoned in favor of a no-risk deal.

This point is confirmed by the government's own evidence at trial.  According to Mr. Napier – the only government witness who had face-to-face contact with Mr. Ferguson regarding the LPT – the idea of a "no risk" transaction was first conceived no earlier than

---

[3]  Although this is a subjective standard, the prosecution's own witnesses – including the principal drafter of FAS 113 – testified that a company will meet this standard, and will be entitled to book the entire transaction as "risk," even if it has only a 10% risk of a 10% loss. *See* Tr. at 560 (Schroeder); Tr. at 2640-42 (Houldsworth).  This is the so-called "10-10" rule of thumb.  As Robert Herz, Chairman of the FASB stated in an April 12, 2005 Bloomberg article in reference to the "10-10" rule of thumb, a transaction is "insurance if there's been a 10 percent risk of losing 10 percent, . . . that's 1 percent and doesn't sound like much risk to me." Ex. 2 (Bloomberg article).  That modicum of risk is all that separates a "reinsurance" transaction, which entitles an insurance company to include extra loss reserves on its balance sheet, from a "deposit," which does not.

[4]  For example, government witness Jay Morrow, an AIG actuary, agreed that it is "legitimate to do finite reinsurance transactions for balance sheet reasons . . . [t]o achieve a balance sheet result." Tr. at 1968.  Similarly, Alice Schroeder, the principal drafter of FAS 113, agreed that "of course" there is "nothing in FAS 113 that prohibits finite reinsurance from being accounted for as [risk] if it meets the same standard that applies to all types of reinsurance[.]" Tr. at 569.  And government witness John Houldsworth, who specialized in selling finite reinsurance for a Gen Re subsidiary, agreed that "many other . . . companies" strike finite reinsurance deals primarily "to manage a broad range of financial objectives," including "earnings management" and "ratings enhancement." Tr. at 2632. The government introduced no evidence drawing the legitimacy of this widespread and well-known finite reinsurance business practice into question.

November 13, 2000, during a meeting that Mr. Ferguson did not attend, which was *two weeks after* Mr. Ferguson "tasked" Mr. Napier with coordinating the LPT deal. Tr. at 734. During his cross examination, Mr Napier, summarizing his earlier testimony, made it abundantly clear that at the time Mr. Ferguson "tasked" him, a "no risk" deal had not been discussed at all:

> Q.    Now, Mr. Napier, the one fact I think you've made clear over and over again during your testimony is that during the October 31 conversation between Ron and Mr. Greenberg, there was no discussion about risk at all in that conversation, correct?
>
> A.    That is correct.
>
> Q.    No talk about finite risk, no talk about traditional risk, no talk about no risk, no talk at all?
>
> A.    No discussion of risk, that's right.

Tr. at 1660; *see also* Tr. at 1513 ("Q. There's no notation that Hank Greenberg wanted a transaction that had no risk, is there, sir?; A. That's correct"). In fact, Mr. Napier also testified that from the time Mr. Ferguson first "tasked" him with coordinating the LPT until at least two weeks later, the Gen Re team was considering using real risk transactions, indeed, even high risk transactions. *See* Tr. at 1510-12; 1691-92.

Consistent with this testimony, Mr. Napier repeatedly admitted during the trial that there was no crime in October (when Mr. Ferguson "tasked" him) because there was nothing illegitimate about the LPT at that time:

> Q.    You pled guilty to a conspiracy that began in October. What had you done in October that was criminal?
>
> A.    I don't know of anything I did in October that was criminal.
>
>              *          *          *
>
> Q.    And in your mind, had you done anything wrong by November 7[th], Mr. Napier?
>
> A.    No.

Tr. at 1309, 1314. Thus, Mr. Ferguson cannot be found to have recruited Mr. Napier to participate in any criminal activity on October 31.

Moreover, as the evidence at trial also revealed, at the same time Mr. Ferguson "tasked" Mr. Napier, Mr. Ferguson instructed him to involve in the LPT "at a minimum" two of Gen Re's most senior executives, Lee Steeneck, Gen Re's Chief Actuary, and Tom Kellogg, then Gen Re's Chief Operating Officer (in addition to Joe Brandon). *See* Ex. 3 (Government Exhibit ("GX") 8). Both Mr. Steeneck and Mr. Kellogg were told about the call from AIG's CEO on October 31, and knew everything about the request that Mr. Napier knew. *See id.* Moreover, Jim Sabella, Gen Re's Chief tax officer, was the individual on Gen Re's team that was "leading the process" in the weeks following October 31st. Ex. 4 (GX 19A). The government, however, never accused Mr. Steeneck, Mr. Kellogg or Mr. Sabella of any wrongdoing. Thus, even the government's own evaluation of individual culpability of Messrs. Steeneck, Kellogg and Sabella buttresses the conclusion that Mr. Ferguson did not recruit Mr. Napier to participate in any criminal activity.[5]

Finally, Mr. Ferguson was not involved in many of what the prosecution described as the nefarious aspects of the LPT. For example:

- Mr. Ferguson was not present at the meeting in which a "no risk" transaction was allegedly conceived

- Mr. Ferguson did not recruit any others to participate in the fraud

- Mr. Ferguson had no control or influence over any alleged co-conspirator from September 17, 2001 (when he stepped down as CEO) through the end of the LPT fraud in 2005

- There is no evidence that Mr. Ferguson, who did not participate in any of the myriad taped telephone conversations that the prosecution argued reflected criminal intent, was even told about the specific elements of those calls

---

[5] The government does not even suggest that Mr. Ferguson recruited anyone else, including any of the other four defendants.

- Mr. Ferguson had no involvement in the drafting of the LPT contracts

- Mr. Ferguson never authorized, knew about, or saw the alleged fake offer letter

- Mr. Ferguson had no involvement in the selection of and had no knowledge of the specific underlying accounts that made up the LPT

- Mr. Ferguson had no knowledge that any of the underlying transactions were already 100% reinsured (Tr. at 3112) and had no knowledge that the reserves transferred to AIG were, net of other reinsurance, less than $500 million

- Mr. Ferguson had no meetings, received no briefings and had no conversations about the LPT with Mr. Houldsworth – the LPT's true "architect," "mechanic," "structurer" and "sly negotiator" (Tr. at 1324, 1425, 2634, 3001) – or with Messrs. Vukelic, Gerhardt, Graham, Garand, McCaffrey or Milton

- Mr. Ferguson had no knowledge that AIG did not do any due diligence with respect to these underlying accounts. Indeed, given the November 30, 2000 e-mail he received advising that "the ball [was] in the[] court" of AIG's "finance folks" (Ex. 5 (GX 47)), Mr. Ferguson had no reason even to suspect that AIG might not have done any due diligence

- Mr. Ferguson had no knowledge of, involvement in, or influence over AIG's decision to account for the LPT as reinsurance

- Mr. Ferguson did not make (nor is there any evidence he encouraged AIG to make) any of the alleged misstatements to the investing public upon which the case is premised

- Mr. Ferguson had no knowledge that others at Gen Re had taken the position that Gen Re would not pay the $10 million cash premium to AIG until Gen Re had received $10 million from AIG on an unrelated transaction

- Mr. Ferguson had no involvement in the concept, negotiation, or structuring of the HSB-related side arrangements (including the HSB commutation and the Cox treaty) that effectuated the receipt of the 1% LPT fee and the return of the 2% cash premium

- Mr. Ferguson had no knowledge of the retrocession agreement between Gen Re and NUFIC, let alone its allegedly sham nature

- Mr. Ferguson did not authorize the wire transfers of money between AIG and Gen Re

- Mr. Ferguson had no involvement in or influence over the decision whether or not to commute part or all of the LPT

- Mr. Ferguson received no fruits of the crime, either financial or in terms of career enhancement

Accordingly, there is a great deal of evidence to support a *minor* role downward adjustment. In any event, as explained in further detail below, an aggravating role adjustment is plainly unwarranted.

## B.    Mr. Ferguson's CEO Title is Irrelevant

The government argues that Mr. Ferguson's alleged leadership of the LPT is demonstrated by the fact that Mr. Ferguson was Gen Re's CEO "and all three of the other Gen Re defendants were his subordinates within the Gen Re corporate structure, as were the two cooperating witnesses who pled guilty." Gov't Memo at 40. This argument must be rejected.

Courts have repeatedly held that the mere fact that a defendant was a leader of an organization in which a crime was committed, does not render that defendant a leader of the criminal activity for purposes of § 3B1.1. *See, e.g., United States v. DeGovanni*, 104 F.3d 43, 46 (3d Cir. 1997) ("the mere fact that DeGovanni was their workplace supervisor, is not enough to render him more culpable *for purposes of the conspiracy* than the other 'rank and file' participants") (emphasis in original); *United States v. Litchfield*, 959 F.2d 1514, 1523 (10th Cir. 1992) ("Although defendant might be termed an organizer or leader of the mining operation, that operation was not itself criminal activity"); *United States v. Forchette*, 220 F. Supp. 2d 914, 919 (E.D. Wis. 2002) ("The fact that defendant controlled . . . employees in their work duties does not mean that he controlled their criminal activities"); *see also* U.S.S.G. § 3B1.1, App. Note 4 ("titles such as 'kingpin' or 'boss' are not controlling").

Moreover, Mr. Ferguson was CEO of Gen Re for only the first ten and a half months of the 2000 through 2005 charged conspiracy. On September 17, 2001, Mr. Ferguson voluntarily stepped down as CEO, relinquished all of his responsibilities and decision-making

authority to his successor as CEO, Joe Brandon (an alleged unindicted co-conspirator). *See* Ex. 6 (GR1_0741116) (Mr. Ferguson's June 2002 e-mail to Mr. Brandon, sent upon Mr. Ferguson's retirement as an employee: "Today you carry all the titles – though you have had all the responsibility since 17 Sept 01"); *see also* Ex. 7 (GR1_0428695). To support an aggravating role enhancement, however, "the government must show that each member of the organization is answerable to the defendant *and is under his continuing control*." *United States v. Smith*, 951 F.2d 1164, 1120 (10th Cir. 1991) (emphasis added). After his resignation as CEO, it is indisputable that Mr. Ferguson did *not* continue to have any control over any of the other participants in the LPT (even from a titular corporate responsibility perspective).

**C.     Mr. Ferguson Did Not Exercise Discretion, Control or Authority Over Others With Respect to the LPT Fraud and had Minimal Involvement in the LPT's Planning and Organization**

The government correctly notes that factors to be considered under § 3B1.1, include "the degree of discretion exercised by [the defendant], the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy." Gov't Memo at 40; quoting *United States v. Beaulieau*, 959 F.2d 375, 379-80 (2d Cir. 1992). But the fact that, as CEO of Gen Re through September 17, 2001, Mr. Ferguson *had* discretion, control and authority does not mean that he *exercised* that discretion, control or authority with respect to the LPT, and, in fact, he did not do so.

To the contrary, the evidence at trial demonstrated that Mr. Houldsworth, together with Mr. Vukelic and Mr. Gerhardt, were the ones who exercised discretion, control and authority over the LPT's fraudulent aspects, and who were most heavily involved in the LPT's fraudulent organization and planning. As this Court will recall, Mr. Vukelic was Mr. Houldsworth's direct boss, and Mr. Gerhardt was Mr. Houldsworth's "boss's boss." Tr. at 1362-63. Unlike Mr. Ferguson, both Messrs. Vukelic and Gerhardt were Mr. Houldsworth's brain-storming partners with respect to the structuring of the LPT reinsurance portfolio in a manner

which removed any possibility of risk transfer to AIG. *See, e.g.,* Ex. 8 (GX 18A), Ex. (GX 21A), Ex. 10 (GX 23), Ex. 11 (GX 23A), Ex. 12 (26), Ex. 13 (GX 56A), Ex. 14 (GX 98), Ex. 15 (GX 103), Ex. 16 (Ferguson Ex. 144), Ex. 17 (Ferguson Ex. 145), Ex. 18 (Monrad Ex. 306), Ex. 19 (Monrad Ex. 317), Ex. 20 (Monrad Ex. 318); *see also* Tr. at 2165, 2494-97, 2680-81, 2758-59, 3141, 3472. It was Messrs. Houldsworth, Vukelic and Gerhardt who knew about and structured the already-100% reinsured nature of certain of the underlying accounts that made up the LPT.[6] Mr. Ferguson, on the other hand, was not involved in any of these brain-storming sessions, never once met with or spoke to Mr. Houldsworth, Mr. Vukelic or Mr. Gerhardt about the LPT, and had no idea about the underlying LPT accounts, their composition or the fact that some of them were 100% reinsured. *See, e.g.,* Tr. at 3106-07. Significantly, Messrs. Gerhardt and Vukelic – senior executives who played far more important roles than Mr. Ferguson – were never indicted and, thus, may never face criminal penalties.

Additionally, Joe Brandon – who Mr. Napier conceded was "far more heavily involved" in the LPT than Mr. Ferguson, even during the early stages of the LPT (Tr. at 1312) – was never indicted and, thus, he too, may never face criminal penalties.[7] Indeed, Mr. Brandon recruited the key members of the Gen Re LPT team, including Chris Garand (Tr. at 655-56), Betsy Monrad (Tr. at 713), and John Houldsworth (Tr. at 181, 4146). Mr. Brandon suggested using reserves from CRD in Ireland to avoid U.S. disclosure. *See* Tr. at 654-55, 660-61, 737, 1303-04, 1323-24, 1513-14, 4017; *see also* Ex. 21 (GX 6) ("stay away from the US companies" and go "off-shore"); Ex. 3 (GX 8);

---

[6]    Indeed, Mr. Gerhardt was the one who suggested that Mr. Houldsworth use already reinsured accounts for the LPT, including the Coral Re account. *See* Ex. 9 (GX 21A) ("Gerhardt: What about ceding back the Coral reserves to them?; Houldsworth: Oh you're a bad boy . . . You're a bad boy . . . we already have them reinsured."); *see also* Tr. at 2986-88.

[7]    While Mr. Ferguson was the global CEO, it is noteworthy that Mr. Garand and Ms. Monrad reported directly Mr. Brandon just as Mr. Napier's and Mr. Graham's respective supervisors reported directly to Mr. Brandon.

Mr. Brandon directed Ms. Monrad to call Mr. Houldsworth to inquire whether the Dublin subsidiary had $500M in liabilities available for a transaction. *See* Tr. at 4017-18, 4015-17, 1322-24; *see also* Ex. 23 (Monrad Ex. 5A). And in April 2001, Mr. Brandon approved the "unwind" of the HSB-related transactions "to fund the" LPT. Ex. 24 (Monrad Ex. 394).

When Mr. Brandon replaced Mr. Ferguson as CEO of Gen Re in September 2001, Mr. Brandon's role in the LPT was enhanced and Mr. Ferguson's involvement virtually ended. Indeed, Mr. Brandon received the December 18, 2001 e-mail (Ex. 25 (GX 195)) that "lays out the roadmap for how the portion of the secret side deal where the money is going [would] be returned and all the machinations that were done to do that. . . ." Tr. at 1042. This e-mail, which the government characterized as the "key money movement e-mail in the entire case" (*id.*) was never received by Mr. Ferguson. In December 2001, Mr. Brandon signed the various wire transfers of money to effectuate what the government has described as the "round-trip" of LPT premium. *See* Ex. 26 (GX 209).



As Mr. Brandon would later put it to Mr. Napier, instead of unwinding the LPT, he – not Mr. Ferguson – decided to "let sleeping dogs lie." Tr. at 1197-1199.

Thus, it was a decision made by Mr. Brandon – not Mr. Ferguson – which was the sole reason why AIG continued to include the LPT loss reserves in its SEC filings for three more years. This in turn, led to the defendants being charged with a conspiracy that extended through January 2005 (Count 1) and substantive counts for AIG's misstatements in financial statements

for Fiscal Years 2002 and 2003 (Counts 9, 10, 12, 13, 15 & 16), and to the application of the post-2003 version of the Guidelines (including the post-Sarbanes-Oxley increases to § 2B1.1).

**D.    Mr. Ferguson Exercised No Authority With Respect to the LPT's Reputation or Securities Regulatory Risk**

**1.    Reputation Risk**

In further support of its erroneous argument for an aggravating role enhancement, the government asserts that Mr. Ferguson, as "head of the Gen Re Executive Committee, or 'EC' . . . had final authority as to whether the LPT deal would be approved or not given its 'reputation risk.'" Gov. Sentencing Br. at 41. Mr. Ferguson's status and authority as head of the EC is irrelevant. The question is did he exercise that authority to further the LPT fraud and the answer is an unequivocal 'no'.

The government here ignores the unequivocal, thrice-iterated, trial testimony of Mr. Houldsworth that Gen Re's Chief Underwriter, Tad Montross – not Mr. Ferguson – signed off on the LPT's reputational risk. Mr. Montross, *the current CEO of Gen Re*, was not even alleged to be a co-conspirator. In fact, despite the government's almost palpable invitation to Mr. Houldsworth to change his testimony to implicate Mr. Ferguson (as opposed to, or in addition to, Mr. Montross), Mr. Houldsworth declined the invitation:

> Q.    . . . what was the purpose for your call to Mr. Montross?
>
> A.    Well, my – underwriters have underwriting guidelines that guide how they must act in certain situations.    The alternative solutions in underwriting guidelines meant that for, if you identified significant reputational risk, you were obliged to clear it with certain people.  And in this case it would be, to my mind, *the only person who could clear it was Tad Montross,* who was the chief underwriter for the group, and that's why I called him.  That's why I said in the phone call I was obliged to call him.
>
> Q.    And Mr. Montross indicated Ron signed off on this deal since it's his deal.  Did that satisfy your inquiry or not?

11

Mr. Horowitz:   Objection, Your Honor.  We are talking now about what Mr. Montross said.

The Court:   That objection is sustained.

Q.   Did Mr. Montross' answers to your inquiry here, did you feel like you had done what you needed to do under the underwriting guidelines?

\*   \*   \*

A.   Yes, I felt it did. [Mr. Montross] clearly knew about the deal.  I said the AIG deal and he said the loss portfolio, so to me, he clearly – he knew what I was calling about. [Mr. Montross] knew there was reputational risk in it.  As soon as I said, he agreed with me.  Yes.

So I felt *[Mr. Montross] knows the deal, he knows the reputational risk, he's not telling me not to do it.  He's therefore approving it.*  Well, giving me the all clear to move ahead.

Tr. at 2369-70 (emphasis added).  On cross-examination, Mr. Houldsworth again testified that it was Mr. Montross who signed off on the LPT's reputation risk. *See* Tr. at 2880-81; *see also* Tr. at 3158.

Having disregarded Mr. Houldsworth's dispositive testimony on the issue, the government instead relies on (i) a more than hour-long November 15, 2000 telephone call (transcribed on a 43-page transcript) among Mr. Houldsworth and others (but not including Mr. Ferguson) in which neither Mr. Ferguson's name nor his title were even once mentioned; and (ii) the government's misleading summary of Mr. Napier's testimony about a discussion he and Ms. Monrad had with Mr. Ferguson "on that same day," in which the LPT's reputational risk (not legal or regulatory risk) allegedly was mentioned. *See* Gov't Memo at 41-42.

First, the November 15 telephone conversation that the government cites (Ex. 28 (GX 24A)) in no way indicates that Mr. Ferguson approved the LPT's reputational risk.  Rather, when Mr. Houldsworth stated that the LPT carried reputation risk, Ms. Monrad responded that "[t]hat's an EC decision." *Id*.  Again, as Mr. Houldsworth clarified, the "only [member of the

12

EC] who could clear [the LPT's reputation risk] was Tad Montross," not Mr. Ferguson, and Mr. Montross, in fact "approv[ed] it." Tr. at 2369-70.

Second, the government misleadingly asserts that Mr. Ferguson's alleged approval of the LPT's reputational risk is demonstrated by Mr. Napier's testimony that Mr. Ferguson "accepted the point." Gov't Memo at 41-42. In fact, Mr. Napier testified that he (Mr. Napier) did not recall Mr. Ferguson saying anything in response to Ms. Monrad's statement that "reputation risk is something we're putting on your [Ron's] desk." *Id.*; citing Tr. at 807 ("Q. Did [Mr. Ferguson] say anything [after Ms. Monrad brought up the reputational risk]? A. I don't recall that he did."). In any event, it was after this conversation that Mr. Montross – not Mr. Ferguson – approved the LPT's reputational risk.

### 2.   Securities Regulatory Risk

The government also erroneously asserts that Mr. Ferguson "ultimately made the call" on the "*serious* risk" of attack by insurance or securities regulators of the LPT. Gov't Memo at 43 (emphasis added). In support of this fallacious claim, the government improperly relies on GX 84 in a manner reminiscent of its rebuttal summation, during which the government egregiously misquoted that same exhibit to the jury *four times*.[8] GX 84, a December 22, 2000 e-mail from Mr. Graham to Mr. McCaffrey (and no one else), actually states:

> Ron et al have been advised of, and have accepted, the *potential reputational risk* that US regulators (insurance and securities) *may* attack the transaction and our part in it.

Ex. 29 (GX 84) (emphasis added). Nothing in this e-mail even suggests that Mr. Ferguson was informed of, or "ultimately made the call" on, any actual "*serious*" LPT risk. Rather, GX 84 only proves that Gen Re's General Counsel, Mr. McCaffrey – not Mr. Ferguson – was advised

---

[8]   *Four* times during its rebuttal summation, the government misquoted GX 84 stating that "Ron et al" were advised that regulators "*would*" attack the transaction (Tr. at 4585, 4587, 4609, 4635); and four times the Court had to correct the government that GX 84 merely stated that regulators "*may*" attack the transaction (Tr. at 4586, 4587, 4610, 4636).

by Mr. Graham that the LPT had a *potential* securities regulatory risk.



First, the government's *lead*

*investigator*, Agent Tendick, unequivocally conceded that there was no evidence that Mr.

Ferguson was ever made aware of any risk that U.S. insurance or securities regulators may attack

the LPT or Gen Re's part in it, let alone a "serious" risk.  *See* Tr. at 3969-70.  Agent Tendick

reached this conclusion after heading the government's investigation of the LPT for nearly three

years (Tr. at 3784, 3965), during which the government interviewed dozens of witnesses

and reviewed an enormous number of documents.

*See* Tr. at 3967.



Mr. Ferguson made it clear that he wanted to be advised about such concerns. In particular, on November 1, 2000, Mr. Brandon sent an e-mail to Mr. McCaffrey, and copied Mr. Ferguson, as well as the members of the Gen Re Legal Department, including Mr. Graham, thanking them for alerting him to a questionable situation unrelated to the LPT:

> Thank you for alerting us to this situation. Everyone in the Legal Department should know that *we very much want you to let us know when you see activities by any member of the Group that you think could cause a loss of* either *reputation* or money.

Ex. 32 (GR1_1121702). Later that evening, a mere two days after Mr. Ferguson first spoke with Mr. Greenberg about the request that led to the LPT, Mr. Ferguson replied to Mr. Brandon with a copy to Messrs. McCaffrey and Graham, and other members of Gen Re's legal department by emphatically stating: "Ditto!" *Id.*

### E.    Mr. Ferguson's Request to "Keep the Circle As Tight As Possible" Does Not Evidence Leadership of the Charged Fraud

The government erroneously asserts that Mr. Ferguson's November 17, 2000 e-mail, GX 31, demonstrates that he was a leader of the LPT. *See* Gov. Sentencing Br. at 42. The government, which mischaracterized this e-mail at trial, does so again here.

---



On November 17, 2000, Mr. Napier spoke with Mr. Milton about the LPT and memorialized his conversation in an email sent to Messrs. Houldsworth, Brandon and Mr. Ferguson, Ms. Monrad, and three others who have never been alleged to be co-conspirators – Mr. Montross (Gen Re's Chief Underwriter and today Gen Re's CEO), Tom Kellogg (Gen Re's President and COO), and Jim Sabella (Gen Re's Chief Tax Officer). Ex. 34 (GX 31). In response to Mr. Napier's e-mail, Mr. Ferguson stated: "Note to all – let's keep the circle of people involved in this as tight as possible." *Id.*

Far from demonstrating that Mr. Ferguson was a leader or manager of the LPT (*see* Gov't Memo at 42), this e-mail was merely a reiteration of Mr. Ferguson's longstanding and wholehearted commitment to respecting client confidentiality and the policies set forth clearly and stressed in Gen Re's Code of Conduct, which he authored:

> Our business often requires that we collect substantial amounts of information about our clients. The way we treat such information is extremely important. The safe keeping of such information is key to our relationship with out clients, and it is imperative that we be certain that our actions with respect to this information not conflict with the interests of our clients . . . Therefore, it is our Company's **strict policy to maintain the confidentiality** of such information and not to divulge it . . . In addition, information received from a client should be disclosed **only to those with a "need-to-know**."

Ex. 35, at 16 (GX 266) (emphasis added); *see also* Tr. at 1407. It is telling that Mr. Ferguson did *not* instruct that the circle be kept tight or that information be withheld from anyone who needed the information. Rather, he said "keep the circle *as tight as possible*." Ex. 34 (GX 31). "As tight as possible" echoes Gen Re's Code of Conduct, which states that client information is to be kept on a "need to know" basis. Ex. 34, at 16 (GX 266) ("In addition, information received from a client should be disclosed only to those with a need-to-know.").

16



Indeed, Mr. Ferguson *regularly* spoke and reminded his colleagues about the importance of behaving honorably by maintaining client confidentiality. For example:

- In an internal "Announcement Q&A" prepared for Gen Re employees in connection with his resignation as CEO in September 2001, Mr. Ferguson wrote: "You can continue to expect underwriting excellence, *integrity, discretion and confidentiality* . . . all adding up to fair, honest and open long-term business relationships that are mutually beneficial" Ex. 37, at 5 (CWT-RF000263) (emphasis added); *see also* Ex. 38, at 6-7 (GR1_0618902) (Ferguson's draft e-mail to Cologne Re directors announcing his resignation and stating: "the people behind the promise stand for: *Integrity, discretion/confidentiality* . . . all adding up to a fair, honest and mutually beneficial long-term business relationship with our clients) (emphasis added).

- Throughout the course of his career at Gen Re, Mr. Ferguson repeatedly emphasized to Gen Re "associates" that they need to think of themselves as a "private banker." *See, e.g.,* Ex. 39 (GR1_0435287) (in one of Mr. Ferguson's rare interviews, he told "Reactions" magazine: "Basically, we see ourselves as a private banker to our clients"); Ex. 40 (GR1_0633533) (in an October 12, 2000 e-mail to Messrs. Brandon and Montross, Mr. Ferguson states that he "keep[s] hammering on this," referring to the "re:" line of the e-mails, which state "PRIVATE Banker," with "private" in all caps).

- In a June 1998 video presentation made in connection with Berkshire Hathaway's acquisition of Gen Re, Mr. Ferguson explained: "we need to continue to project to the clients that they are our number one priority. That we will continue to operate with this change of ownership the same kind of *integrity and confidence* that we've always had, that *we never talk about clients*. We never share or co-mingle information . . ." Ex. 41 (transcript of audio file Bates-numbered GR1_0974237) (emphasis added).





Additionally, Mr. Houldsworth was one of *seven* individuals to whom Mr. Ferguson's November 17 e-mail was sent. Mr. Ferguson had never worked with Mr. Houldsworth, and Mr. Houldsworth had never been asked by Gen Re to help with a transaction for a U.S. client *See* Tr. at 2701. Thus, it makes perfect sense that Mr. Ferguson would have wanted to make sure that Mr. Houldsworth and CRD – in their small outpost in Ireland – were as sensitive to the importance of client confidentiality as Mr. Ferguson and his colleagues were in the U.S.

Moreover, there are at least two legitimate and sound business reasons why Mr. Ferguson and the Gen Re team wished to keep the LPT negotiations confidential in November 2000. First, in November 2000, the LPT negotiations were just that – negotiations. As Mr. Houldsworth put it, he (Mr. Houldsworth) "wanted to keep as few people involved [in the LPT] as possible until [they] actually sign something." Ex. 43 (GX 80). Of course, once the LPT was signed, AIG was obligated to – and did – publicly disclose its existence through the filing of its 2000 and 2001 annual financial statements in all 50 states, Washington D.C., Guam, Puerto Rico, the U.S. Virgin Islands, Canada and at least 48 other foreign countries. *See* Stipulation [Dkt. # 887]. Second, as Mr. Napier testified, Mr. Brandon expressed concerned about the possible marketplace *mis*impressions that Gen Re might be having some financial problems that necessitated its off-loading of reserves to AIG. *See* Tr. at 1408-10, 1414-15, 1513-14, 1715-17.

In any event, far from "admonishing individuals . . . to keep the number of people involved . . . limited" (Gov't Memo at 42), Mr. Ferguson took proactive steps to ensure that all

senior executives at Gen Re who would normally play a gatekeeper role were involved in the transaction. In particular, Mr. Ferguson's e-mail was sent to, among others, Mr. Brandon, who was a Gen Re Executive Vice President and the CEO of the entire North American region, and who, according to Alice Schroeder's testimony, knew as much about the governing standards for accounting for finite reinsurance deals as reinsurance as anyone in the United States (Tr. at 530); Jim Sabella, who was a Senior Vice President and Gen Re's chief tax officer; Mr. Houldsworth, who was the CEO of CRD; Mr. Montross, who was the Chief Underwriting Officer of Gen Re; and Tom Kellogg, who was President and COO of General Reinsurance Corporation. As such, all of the U.S. members of Gen Re's Executive Committee (Messrs. Montross, Kellogg, Brandon and Ferguson) were on this e-mail. In addition, because Mr. Ferguson had instructed Mr. Napier early on to keep Mr. Steeneck, Gen Re's Chief Actuary, involved in the transaction, the e-mail was sent to him as well. *See* Ex. 3 (GX 8).

As time went on, Mr. Ferguson learned of, and neither objected to, nor expressed any concern at all about, the significant expansion of the LPT team to include many additional gatekeepers, including Gen Re's *independent* outside auditors, Deloitte & Touche. Indeed, Mr. Houldsworth admitted that he "told Ms. Fulton [the Deloitte audit partner] everything I [Houldsworth] knew about the deal," and granted Ms. Fulton full access to the LPT file. *See* Tr. at 2645, 3120 and 3123. And Mr. Napier testified that he never heard Mr. Ferguson object to any individual being brought into the transaction. *See* Tr. at 1649-50.[10]

_____

[10] The record established that the following 39 individuals were involved in the LPT: (i) the five defendants; (ii) the two cooperating witnesses; (iii) the five alleged unindicted co-conspirators; and (iv) 27 individuals not alleged to be co-conspirators, including Robert Beier, AIG's Assistant Comptroller (Tr. at 2068); John Blumenstock, an AIG reinsurance accountant (Tr. at 2068); Douglas Bonnar, a CRD Board Member (Tr. at 2914); ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ John Byrne, a CRD Underwriter (Tr. at 2706); Ronnie Carroll, a CRD Underwriter (Tr. at 3143); Mike Castelli, AIG's Comptroller (Tr. at 954); Margaret Dennehy, a CRD account administrator (Tr. at 2913); Frank Douglas, the head AIG's DBG Actuarial Department (Tr. at page 1902); Mary Fulton, the Deloitte & Touche Audit Partner (Tr. at 2835); Phil Garrison, an employee in Gen Re's tax division (Tr. at 1647); Lawrence Golodner, AIG's assistant comptroller in financial accounting (Tr. at 2043); Robert Jacobson, AIG's DBG Comptroller (Tr. at 2067); Tom Kellogg, Gen Re's Chief Operating Officer (Tr. at 704); John Keogh, a CRD Board Member (Tr. at 2914); Peter Lutke-Bornefeld, a CRD Board Member (Tr. at 2914); Jurgen Meisch, a CRD Board

**F.    Mr. Napier's Updates to Mr. Ferguson Do Not Demonstrate that Mr. Ferguson was a Leader of the Charged Fraud**

The government unfairly and erroneously argues that Mr. Ferguson was a leader of the LPT because (i) on November 7, 2000, he asked Mr. Napier to "keep him posted," and (ii) on November 17, 2000, Mr. Napier further "updated [Mr. Ferguson] on the relevant developments about the deal" and "kep[t] Ron in the loop." Gov't Memo at 41, 42; citing GX 9; GX 31; Tr. at 945. As an initial matter, and as explained above in the Introduction, as of November 7, 2000, the discussions were still focused on a risk-based LPT, not the "no risk" LPT charged in the Indictment. Thus, the request Mr. Ferguson made to Mr. Napier cannot properly be used even to demonstrate an involvement in a fraud, let alone leadership in one. In any event, the fact that Mr. Ferguson merely asked to be kept "posted" and that Mr. Napier sent him e-mails to keep him "in the loop" is entirely consistent with Mr. Ferguson's *minimal* involvement, not leading role, in the LPT. Indeed, Mr. Napier kept Mr. Ferguson "in the loop" because Mr. Ferguson was not intimately involved in the LPT planning, structuring, organization, or decision-making process. Moreover, as Mr. Napier testified, Mr. Ferguson was kept "posted" during "very, very brief" conversations in a "very general high level fashion." Tr. at 738-39.

**G.**



Member (Tr. at 2914); Tad Montross, Gen Re's Chief Underwriting Officer (Trans. at 1641); Annette Morrill, a member of Gen Re's finance department (Tr. at 727); Jay Morrow, an AIG Vice President and actuary (Tr. at 1901); Margaret O'Neill, a CRD accountant (Tr. at 2913); John O'Reilly, an employee at the CRD subsidiary (Tr. at 1648-49); Mark Parkin, the head Deloitte & Touche Partner for the Gen Re audit group (Tr. at 2920); Jim Sabella, Gen Re's Chief tax guy (Tr. at 1645); Howie Smith, AIG's Chief Financial Officer (Tr. at page 816); Lee Steeneck, Gen Re's Chief Actuary (Tr. at 1642); and David Wessel, an AIG accountant (Tr. at 2068).



## H. Mr. Ferguson Did Not "Negotiate" the LPT with Mr. Greenberg

The government erroneously argues that Mr. Ferguson was a leader of the LPT because (i) he "personally negotiated the terms" of the LPT with Mr. Greenberg and (ii) "had all of the high-level, CEO-to-CEO discussions with then-AIG CEO Hank Greenberg." Gov. Sentencing Br. at 42. According to Mr. Napier's testimony, however, Mr Ferguson did *not* negotiate the LPT. Rather, Mr. Ferguson was merely an intermediary, who took the proposed deal terms imparted to him by others (including (i) Mr. Napier, during their "very, very brief," "high level" conversation; and (ii) Mr. Buffett, during their conversations about the LPT fee) and

---



passed that information on to Mr. Greenberg. Tr. at 736-39 & 1438. It was not until December 7, 2000 that Mr. Napier – not Mr. Ferguson – was advised by AIG that there was in effect an agreement in principle. *See* Ex. 50 (GX 49).



## I.    Polite "Thank You's" Do Not Render Mr. Ferguson a Leader of the Charged Fraud

Finally, the government asserts that Mr. Ferguson was a leader in the LPT because he sent a "Thank you" note to his "subordinates for getting the deal done." Gov't Memo at 43; citing GX 85 (Ferguson's Dec. 22, 2000 email, stating "Thank you all for working on this matter – it seems to be very very high profile at AIG and is much appreciated").

There is nothing about a "Thank you" note that demonstrates any of the factors to be considered by this Court in determining whether to apply an aggravating role enhancement under § 3B1.1(a), and not surprisingly, the government cites none in support of this frivolous argument. As the government knows full well, this e-mail does not reflect the exercise of

---

12

decision making authority, or substantial involvement in the planning or organizing of an offense. *See* U.S.S.G. § 3B1.1(a).

Mr. Ferguson regularly expressed his gratitude for the work of Gen Re "associates" because, as made clear in many of the more than 370 letters submitted to this Court in support of Mr. Ferguson, he was unfailingly polite and generous in his praise. *See, e.g.*, the letters of Bondi, Casey, and Rizzi (provided in compilation of letters submitted to the Probation Office). Surely, politeness cannot be a basis for increasing Mr. Ferguson's Guidelines sentence.

**J.      Mr. Ferguson Did Not Receive Any Share of the Fruits of the LPT; and There is No Risk of Recidivism**

The application notes to U.S.S.G. § 3B1.1(a) state that this adjustment is intended to enhance the sentences of those defendants that (i) "tend to profit more from [the crime]" and (ii) "present a danger to the public and/or are more likely to recidivate." U.S.S.G. § 3B1.1 Background; *see also* U.S.S.G. § 3B1.1(a), Application Note 4 (factors to consider include "the claimed right to a larger share of the fruits of the crime"). Not surprisingly, the government failed to mention these highly relevant factors.

After all, it is clear that Mr. Ferguson neither claimed nor received *any* "fruits" of the LPT. Indeed, he has never owned a share of AIG stock and his Gen Re salary and bonus were in no way tied to the consummation of the LPT. Likewise, Mr. Ferguson had no career enhancing motive to commit any LPT fraud. Prior to the LPT, Mr. Ferguson had already risen to the top of his profession having been CEO and chairman of Gen Re since 1987, and only a few days before Mr. Greenberg called Mr. Ferguson on October 31, 2000 to discuss Mr. Greenberg's LPT request, Mr. Ferguson was notified that he had been selected *2000 Insurance Leader of the Year* by The College of Insurance. Ex. 53 (GR1_0768210). Moreover, months before the LPT, Mr. Ferguson had already announced his corporate reorganization plan, which signaled that he would soon be stepping down as CEO in favor of Joe Brandon. *Cf. United States v. Haut*, 107 F.3d 213, 217 (3d Cir. 1997) (affirming *minimal* role adjustment based, in part, on the fact that

23

defendants "had no financial interest in the [fraud] and did not benefit in any manner from the [fraud]."); *United States v. Giraldi*, 86 F.3d 1368, 1378-79 (5th Cir. 1996) (affirming *minimal* role adjustment "[g]iven that there was no evidence that [the defendant] benefit[]ed financially from the scheme").[13]

Moreover, as explained in Mr. Ferguson's Initial Sentencing Memo at 91, Mr. Ferguson presents no danger to the public and there is no chance of recidivism.

---

[13]   Notably, Courts have repeatedly recognized that in fraud cases, a defendant's lack of personal is also grounds for a downward departure under (i) U.S.S.G. § 5K2.0 because it makes the case so atypical; and/or (ii) § 2B1.1 App. Note 19(c) because the loss consequently overstates the seriousness of the offense. *See, e.g., United States v. Blarek*, 7 F. Supp. 2d 192, 211 (E.D.N.Y. 1998) (awarding 6-level downward departure where defendants' fraud was "not one[] of pure personal greed or avarice"); *United States v. Kalili*, 100 Fed. Appx. 903, 905-06 (4th Cir. 2004) (upholding 5-level downward departure where defendant in $800,000 bank fraud "did not significantly profit"); *United States v. Walters*, 87 F. 3d 663, 671-72 (5th Cir. 1996) (upholding 2-level downward departure in money laundering case where defendant did not receive any of the ill-gotten gains); *United States v. Milne*, 384 F. Supp. 2d 1309, 1312-13 (E.D. Wis. 2005) (awarding 1-level downward departure to bank fraud defendant in part because "the guidelines failed to take into account . . . that defendant did not spend the bank's money on luxury items but rather to prop up a failing business"); *United States v. Redemann*, 295 F. Supp. 2d 887, 897-98 (E.D. Wis. 2003) (awarding 2-level downward departure where "it may well be that defendant realized no improper gain" even though there was a "loss amount of almost two and one-half million dollars"); *Forchette*, 220 F. Supp. 2d at 926 (awarding 2-level downward departure where "defendant's limited gain in comparison to the amount of loss . . . made this case unusual"); *United States v. Costello*, 16 F. Supp. 2d 36, 38 (D. Mass. 1998) (awarding 9-level downward departure where defendant's gain "was minuscule compared to the value of the" $20 million loss").

## CONCLUSION

For the foregoing reasons, Mr. Ferguson respectfully submits that an aggravating role enhancement is plainly inapplicable. Moreover, for the reasons explained in his Initial Sentencing Memo, a sentence far lower than the one calculated in the PSR is warranted.

Dated:    New York, New York
          September 19, 2008

Respectfully submitted,

_____/s/ Michael E. Horowitz_____

CADWALADER, WICKERSHAM & TAFT LLP
Michael E. Horowitz (Bar No. phv01191)
1201 F Street, N.W.
Washington, DC  20004
Telephone:  (202) 862-2200

Clifford H. Schoenberg (Bar No. ct16215)
Douglas I. Koff (Bar No. phv01207)
One World Financial Center
New York, NY  10281
Telephone:  (212) 504-6000

DALY & PAVLIS LLC
Alfred U. Pavlis (Bar No. ct08603)
107 John Street
Southport, CT 06890
Telephone:  (203) 255-6700

*Attorneys for Defendant Ronald E. Ferguson*

25

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2008, a true and correct copy of Defendant Ronald E. Ferguson's Response to the Government's Sentencing Memorandum was filed electronically in redacted form and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by electronic mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_____ /s/ Clifford H. Schoenberg_____
Clifford H. Schoenberg (Bar No. ct16215)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
Telephone:  (212) 504-6000